SIMCO SALES SERVICE OF MD., INC.,
ET AL. *v.* SCHWEIGMAN

[No. 54, September Term, 1964.]

*Decided December 7, 1964.*

The cause was argued before HENDERSON, C. J., and PRES-COTT, MARBURY, SYBERT and OPPENHEIMER, JJ.

*George T. Tyler,* with whom was *Thomas D. Washburne* on the brief, for appellants.

*Benjamin R. Goertemiller,* with whom were *Matthew Swerdloff* and *Clarence C. Goertemiller* on the brief, for appellee.

SYBERT, J., delivered the opinion of the Court.

Appellee, Frank J. Schweigman, the operator of a motorcycle upon a favored street, obtained a judgment, entered upon a jury's verdict, for personal injury and property damage against appellants, Simco Sales Service of Md., Inc. and Eugene Drumheller, the owner and operator, respectively, of an ice-cream vending truck which entered the favored street from an unfavored street and was struck by the motorcycle, and the defendants have appealed.

The appellants first contend that the record shows no legally sufficient evidence of negligence on their part, but does show that the plaintiff-appellee was negligent, and that therefore the trial court erred in denying their motion for a directed verdict. It thus becomes necessary to review the evidence.

The collision occurred at 9:30 P.M., after dark, in the vicinity of the intersection of Holabird Avenue, a boulevard, and Manor Road, an unfavored street. Holabird Avenue is 48 feet wide and runs east and west, with two lanes for eastbound and two for westbound traffic and a double white line in the center. Manor Road runs north-south and forms an intersection with the north side of Holabird Avenue. Southbound traffic on Manor Road is governed by a stop sign situated 15 feet from the north side of Holabird Avenue. A gasoline station is located at the northwest corner of the intersection. The weather was clear and the streets dry.

There was considerable conflict in the testimony as to how close to the intersection the collision occurred, and the circumstances thereof. The plaintiff-appellee, Schweigman, testified that on the night of the accident he was operating his motorcycle westbound on Holabird Avenue with his headlight turned on, and that as he neared the intersection with Manor Road he was traveling at 28 to 30 miles per hour. When about two car lengths from the intersection he first noticed the appellants' vehicle, which had been southbound on Manor Road, "coming on out fast" into Holabird Avenue and turning west thereon. He said he immediately applied his foot brake, his motorcycle "started to stop", and he then hit the truck. The record shows that the front of the motorcycle struck the rear of the truck, and that Schweigman suffered serious injury. There was no evidence of the speed limit on Holabird Avenue.

The driver of the ice-cream truck, Drumheller, testified that he drove south on Manor Road and stopped twice, once ahead of the stop sign and the second time beside it, and could then see "a good distance" down Holabird Avenue to his left. He said he saw nothing coming, so he started his right hand turn in first gear and shifted to second gear "just about around the corner there", at which point he could see down Holabird to an intersection approximately 1350 feet away. Still seeing nothing approaching, he said, he completed his turn and drove into the left hand lane for westbound traffic on Holabird. He stated that his vehicle was traveling at about 15 to 20 miles per hour, and that he was shifting into third gear, when the truck was hit. He said the impact occurred when the rear of his truck was

halfway past the island between the two driveways of the gasoline station, which point was about 70 feet from the west edge of Manor Road. He stated that the inside lights of his truck were lighted but that he could not remember whether his headlights and other outside lights were on at the time of the impact, although he said he turned them on 20 minutes before the accident. Another witness testified that the top rear lights of the truck were lighted but was not certain whether any of its other lights were on.

Various witnesses placed the point of collision at from 10 to 70 feet west of the intersection. One, Cecil Shifflet, employed at the gasoline station, testified he saw the truck come around the corner, going "fast", that he saw the motorcycle just a second before it hit, but could not describe its speed, and that he estimated the distance from the point of impact to the west curb line of Manor Road as being about 8 or 10 feet. Another, William Racz, also employed at the station, testified that squealing of the truck's wheels made him look up. He saw the truck turning into Holabird Avenue at a "moderate" speed; he then heard a sound "like an automobile clutch and a wheel shift", and "a second after that" he saw the motorcycle strike the back of the truck. He placed the point of collision at about 10 or 15 feet from the intersection. Another eye-witness, Sadie Edney, testified that the impact occurred at a point which proved to be about 46 feet from the west side of Manor Road. The investigating police officer testified he felt the collision occurred 70 feet west of Manor Road because he found at that point some debris and a single skid mark leading to it from near Manor Road. Both the truck and the motorcycle had moved or been moved after the accident, however, and no eye-witness identified the skid mark.

A girl 14 years of age at the time of the accident, testified that she and a girl friend were walking north on the Manor Road sidewalk as the ice-cream truck neared Holabird Avenue. She said that the appellant, Drumheller, and two other young men in the truck "hollered" at her and her friend, but that she and the other girl kept walking and the next thing unusual was that she heard a loud roar and then a crash. She turned to Holabird Avenue and saw that the accident had happened.

As noted above, the appellee, Schweigman, testified that his speed as he approached the intersection was 28 to 30 miles per hour. A plaintiff's witness, who saw the motorcycle some distance from the intersection, thought its speed was in excess of 30 miles per hour. A defense witness, who observed the motorcycle some 90 feet from the intersection, estimated its speed at about 50 miles per hour. Neither witness saw the accident occur.

The case deals primarily with the question whether or not the so-called "boulevard law", Code (1957), Art. 66½, sec. 233, is applicable. The appellants contend that the unfavored driver, Drumheller, had cleared the intersection and had "gotten into his own proper lane without interfering with the favored vehicle's right of way through the intersection", and that therefore the boulevard rule is not applicable, citing the cases of *McCann v. Crum*, 231 Md. 65, 188 A. 2d 537 (1963); *Ness v. Males*, 201 Md. 235, 93 A. 2d 541 (1953); *Shaneybrook v. Blizzard*, 209 Md. 304, 121 A. 2d 218 (1956); *McDonald v. Wolfe*, 226 Md. 198, 203, 172 A. 2d 481 (1961).

We think it unnecessary to review the boulevard rule in detail here, as we have considered it exhaustively in a number of recent cases, such as *Brown v. Ellis*, 236 Md. 487, 204 A. 2d 526 (1964); *McDonald v. Wolfe, supra; Green v. Zile*, 225 Md. 339, 170 A. 2d 753 (1961); and *Harper v. Higgs*, 225 Md. 24, 169 A. 2d 661 (1961). Those cases make it plain that the boulevard law imposes two obligations on the driver entering from an unfavored highway: one, to come to a full stop before entering, and the other, to yield the right of way to traffic on the favored highway. And, as was pointed out in *McDonald v. Wolfe, supra,* the obligation to yield the right of way is not limited by the statute to the area within the intersection itself. "The fact that a collision occurs outside the intersection does not bar the applicability of the boulevard rule, if the collision is the result of a violation of the boulevard law or its equivalent." (226 Md. at p. 203). At the same time, the cases cited, following the rule laid down in *Greenfeld v. Hook*, 177 Md. 116, 8 A. 2d 888 (1939), also recognize that the traveller on the favored highway may not proceed thereon in blind indifference to the safety of persons who have lawfully entered

it, and that therefore the rule is subject to some limitation insofar as negligence or contributory negligence of the driver of the vehicle on the favored highway is concerned.

Viewing the evidence as we have outlined it above in a light most favorable to the plaintiff, as we must in determining whether the plaintiff failed to offer sufficient evidence to establish prima facie that the defendant-operator had been guilty of primary negligence or whether the plaintiff had been guilty of contributory negligence as a matter of law — either of which would have entitled the defendants to a directed verdict in their favor—it is apparent, we think, that the defendants, at most, were only entitled to have their case submitted to the jury. This the trial court did upon both the issue of primary and the issue of contributory negligence, and the jury decided both issues against the defendants; hence it becomes unnecessary to determine the plaintiff's contention that the evidence required an application of the boulevard law. Compare *Savage v. Mills, etc.,* 237 Md. 204, 205 A. 2d 239 (1964). We hold there was no error in denying defendants' motion for a directed verdict.

The appellants next contend that the trial court erred when it instructed the jury in regard to the boulevard law by failing to define the term "proximate cause". This was prejudicial, they say, because it allowed the jury to infer that proximate cause and contributory cause are the same. But the record does not show that the defendants excepted to the court's failure to define "proximate cause" and therefore under Maryland Rule 554 e this issue is not before us. But in any event, the failure to define "proximate cause", even if erroneous (which we do not decide), was not prejudicial. The court carefully and properly instructed the jury as to the boulevard law, and made it clear that violation of that law by the unfavored driver must be the proximate cause of the accident in order to permit recovery by the favored driver under that theory. A reading of the instructions as a whole shows there could have been little chance for misunderstanding by the jury.

The appellants also say the trial court should not have instructed the jury that it might find that the unfavored driver did not stop before entering the intersection since there was no evidence that he did not. The court had just explained the

duties imposed upon the unfavored driver by the boulevard law, to come to a full stop and yield the right of way to favored traffic. We think the court's statement was a proper explanation of these requirements and fully warranted under the evidence. For while there was no explicit contradiction of Drumheller's assertion that he stopped, there was ample evidence—such as the testimony that he came out of Manor Road fast, his screeching wheels, and his "hollering" at the two girls near the corner—from which the jury could reasonably have inferred that he did not stop.

The appellants assign as further error the fact that the court, in reviewing the testimony in its charge, erroneously stated that the appellee's testimony as to his speed was corroborated by a witness. Upon exception, the court in a supplemental charge properly repeated and emphasized its previous admonition to the jury that the court's comments on the facts were in no way binding upon the jury and that its recollection of the facts was controlling. We think the supplemental charge cured any error and that no prejudice resulted. *Mezzanotte Const. Co. v. Gibons,* 219 Md. 178, 148 A. 2d 399 (1959).

It is also urged that the lower court wrongfully overruled the defendants' objections to the testimony of a plaintiff's witness, Harry O. Kayler, as to the fair and reasonable value of hospital and surgical services provided to the plaintiff by the Baltimore City Hospitals, where the plaintiff was employed at the time of the accident. The witness was not a physician but was the Director of Admissions and Accounts at the hospital. He brought with him his department's records and from them testified as to the hospital's charges to the plaintiff. The charges included a flat-rate fee for room and board and other services and certain fees for three operations performed by resident surgeons. In each instance the witness testified that the charge was fair and reasonable, and indicated that the fees were the customary charges made by the hospital for such services. At the trial, the appellants simply objected generally to the testimony of the witness, but on this appeal they raise the point that there was no evidence that the plaintiff was entitled to receive the services as a condition of his employment, or "fringe benefit", and that therefore evidence of the fair and reasonable value

of the services is not within the so-called "collateral source rule" applied in *Plank v. Summers,* 203 Md. 552, 102 A. 2d 262 (1954). They also assert that the plaintiff may not be allowed damages for such services if they were performed as a gratuity (but see *Plank v. Summers, supra,* at p. 562 of 203 Md.). However, Kayler's testimony is clear that the services were charged to Schweigman; and there is also a strong intimation in the testimony that it is the hospital's policy not to require payment for such charges from its employees. This, we think, brings the case within the rule of *Plank v. Summers, supra,* so that the fair and reasonable value of the services was a proper element of damages for which the plaintiff was entitled to recover. See *Transit Co. v. Harroll,* 217 Md. 169, 175, 141 A. 2d 912 (1958). The hospital records would have been admissible as records made in the usual course of business, and Kayler, as their custodian, was properly permitted to testify as to their contents. *Dunn v. State,* 226 Md. 463, 477-478, 174 A. 2d 185 (1961). In addition, Kayler's position as head of the hospital's department of accounts, and his familiarity with the customary charge for such services as those afforded to the plaintiff, rendered his testimony as to the fair and reasonable value of the services admissible. *Zahn v. Heil,* 192 Md. 576, 581, 64 A. 2d 564 (1949).

A contention is made by the appellants that the trial court erred in refusing to grant a mistrial because of the manner in which the plaintiff's counsel utilized a per diem argument in his argument to the jury. Prejudice is claimed because counsel for the plaintiff told the jury in connection with his per diem argument suggesting figures which might be awarded the plaintiff for pain, suffering and loss of earning capacity, that the plaintiff had a life expectancy of 47 years, whereas at the trial an actuary had testified that the life expectancy of an individual of the sex, age and race of the plaintiff was 47 years, indicating that the figure was an average and stating that it did not relate specifically to the plaintiff. After the actuary's testimony, one of the jurors asked the court whether the plaintiff could expect to live 47 years, to which the court replied, "No. * * * He [the actuary] was not speaking directly or particularly of this plaintiff, Mr. Schweigman, when he said that. He was

speaking of an individual, any individual who was that old might normally expect that he would have that life expectancy. Not this particular Plaintiff." Counsel for both parties then stated that that was the meaning of the witness' testimony. When plaintiff's counsel later finished his jury argument, counsel for the defendants moved for a mistrial on the ground that plaintiff's counsel had misstated the testimony when he told the jury the plaintiff had a life expectancy of 47 years, and that this was prejudicial in connection with the per diem argument. The court refused a mistrial, but advised the jury in a supplemental charge that the per diem argument was not evidence, and that in estimating the damages the jury must consider only the evidence. We think the court's explanation of the meaning of the actuary's testimony left no room for confusion in the minds of the jury, and that therefore counsel's obviously inadvertent misstatement was not prejudicial—particularly in view of the fact that counsel suggested an award of approximately $68,000 for the plaintiff's extensive and permanent injuries, and their effects, while the jury's verdict was for only $25,000. Cf. *Harper v. Higgs, supra* (at pp. 40-41 of 225 Md.).

We think there is no merit in the final contention of appellants that the trial court improperly refused to grant certain prayers offered by them. We find that the court refused all prayers, but incorporated in its charge all of the material and appropriate instructions requested in the defendants' prayers. This method was approved by this Court in *Coca-Cola Bottling Wks. v. Catron*, 186 Md. 156, 46 A. 2d 303 (1946). The court did not incorporate in its charge a request by defendants that the court instruct the jury in regard to Code (1957), Art. 66½, sec. 224, with reference to a vehicle following too closely behind another. This instruction was properly refused since under the facts of the case it was inapposite.

*Judgment affirmed; appellants to pay the costs.*